# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

KENNETH McGEORGE                                    CIVIL ACTION

VERSUS                                              NO.  11-1528

BURL CAIN, WARDEN, LOUISIANA                        SECTION "B"(2)
STATE PENITENTIARY

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.  See 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and **DISMISSED WITH PREJUDICE**.

---

[1] Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

# I.    FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, Kenneth McGeorge, a convicted inmate, was indicted in St. Tammany Parish on June 27, 2002, with the second degree murder of Darnell Certain.[2]

The Louisiana First Circuit Court of Appeal summarized the facts of the case as follows:

> The defendant had an ongoing problem with drug use. On several occasions, the defendant had purchased drugs from Darnell Certain, who was known to sell drugs. On the evening of June 9, 2002, the defendant picked up Darnell Certain from his home in Abita Subdivision in Abita Springs, St. Tammany Parish. The defendant was driving his wife's car, a Chrysler New Yorker LHS. Darnell was sitting in the front passenger seat. After driving around, the defendant drove down Lowe Davis Road toward La. Highway 59. At a stop sign at La. Highway 59, the defendant pulled a gun and shot Darnell in the left side of his head. It is not clear if Darnell died immediately from his head wound.
>
> The defendant drove about one-half mile to a farm off of John T. Prats Road, a newly built roadway at that time. The defendant removed Darnell from his car and dragged him into the woods. He left Darnell there and drove back toward Covington. On La. Highway 21, he threw the gun out of the window. The defendant then drove to a friend's house. His friend was not home, but the friend's roommate, Kip, was there. The defendant asked Kip for some towels to wipe off his seats. The defendant began hosing out the interior of his car. Someone in the area called the police and reported the defendant as a suspicious subject. Deputy Dustin Day with the St. Tammany Parish Sheriff's Office was dispatched to the scene about 8:30 p.m.
>
> Deputy Day testified at trial. According to his testimony, upon observing the defendant spraying the interior of his car with a water hose at night, Deputy Day asked the defendant to step away from the car. Deputy Day looked inside the car and asked the defendant what happened. The defendant said that he had been on a fishing trip, had spilled some food, and was trying to clean it out. Deputy Day observed blood splatter on the passenger side door panel and asked the defendant what it was. The defendant said that it was ketchup from a ketchup pack that had burst. After further conversation, the defendant said that the splatter was jelly instead of ketchup. Shortly thereafter, the defendant's wife arrived at the scene. The defendant, after briefly conversing with his wife, approached Deputy Day and informed him that he wanted to change his story. The defendant

---

[2]St. Rec. Vol. 1 of 8, Indictment, 6/27/02; Grand Jury Return, 6/27/02.

stated that he did not spill food in his car.  He stated he had been in the Abita Nursery Subdivision trying to buy drugs, and his drug dealer got in the car and tried to rob him at gunpoint.  The defendant stated he grabbed a hammer and hit the man in the head with the hammer a couple of times, then opened the passenger side door and pushed the man out of the car onto Nursery Street and drove off. Deputy Day turned the scene over to his supervisor and drove to the Nursery Street area to see if he could find the man who allegedly was struck in the head with a hammer.  Deputy Day did not find the man or any evidence, such as blood, that would corroborate the defendant's story.

The following day the defendant was brought in for questioning by Sergeant James Davis and Detective Sergeant Jerry Hall, both with the St. Tammany Parish Sheriff's Office.  The defendant was not under arrest at this time.  The interview was recorded, and the audiotape was played for the jury.  In the interview, the defendant told essentially the same fabricated story that he had told Deputy Day, except for several details.  He claimed that he was looking for drugs and picked up a man he did not know in the Abita Subdivision.  After the defendant had been driving for a short while, the man pulled out a pistol and demanded the defendant's money.  The defendant grabbed a homemade chipping hammer from behind the seat and struck the man in the face a couple of times with the hammer.  The man began bleeding profusely.  The defendant drove to Nursery Street and pushed the man out of the car.  Several days after the interview, Darnell's body was found and the defendant was arrested.

Dr. Michael DeFatta, a pathologist who performed the autopsy on Darnell, testified at trial.  According to Dr. DeFatta, the body was in an advanced stage of decomposition.  The head area was basically a skeleton because of a significant amount of tissue loss to that area.  There was mummification of the upper portion of the body and certain portions of the lower extremities.  Dr. DeFatta could not be certain whether Darnell had sustained trauma to his face since there was no soft tissue to examine.  However there were no fractures of the bones in the face. Darnell had sustained a gunshot wound to the left temple, and the bullet was recovered in the bottom portion of his skull.  The results of the toxicology report were negative.  No money was found on Darnell's body.  According to Darnell's fiancee, Sherome Green, when Darnell left with the defendant on the day he was killed, Darnell had about $1,000 on him.  Detective Sergeant Hall testified on cross-examination that Darnell's rap sheet indicated he had convictions for aggravated assault with a dangerous weapon, burglary, attempted burglary, and a drug charge.  On redirect examination, the prosecutor had Detective Sergeant Hall identify the bill of information for Darnell's aggravated assault charge, which indicated that the charge was nol-prossed.

The defendant testified at trial.  He had two prior convictions of simple possession of marijuana and simple battery.  He had been taking drugs, both legal and illegal, for many years.  He admitted that he shot Darnell, but claimed the

shooting was in self-defense. He testified that he had bought drugs from Darnell on prior occasions six or seven times. On the night of the killing, according to the defendant, he picked up Darnell at his house because he wanted crack cocaine. Darnell did not have the drugs on him, so the defendant drove Darnell to two houses. Darnell went inside the houses, while the defendant waited outside in his car. After leaving the second house, Darnell said they needed to "go to Abita." The defendant drove toward Abita Springs on Lowe Davis Road. When they came to the stop sign at La. Highway 59, Darnell asked for the money. The defendant gave him $90 (a $50 bill and two $20 dollar bills). Darnell then demanded the rest of the money, and told the defendant, "If you don't give me the rest of the money, I'll pop a cap in your ass." The defendant said that was all he wanted to spend. Darnell responded, "Empty the rest of your pockets out before I kill your f---ing ass." The defendant told him to take the money and get out of the car. The defendant said, "If you don't give me the rest of your money, I'm going to kill your f---ing ass." Darnell then reached around the side of him, as if reaching for a weapon. The defendant, fearing that Darnell was going to kill him, reached between the seats, pulled out a .22 revolver, and shot Darnell. The defendant then drove to a nearby farm where he used to hunt, and he dragged Darnell's body into the woods. He drove back toward Covington and, on La. Highway 21, he threw the gun out of the window. The defendant never saw Darnell with a gun, nor did he ever find a gun on Darnell. However, he believed that Darnell had a gun.

The defendant further testified that he lied about hitting Darnell with a hammer because it "sounded a whole lot better to say I hit somebody in the head with a hammer." He also lied about where he "dumped the body." When the defendant was asked if the statement he gave to Detective Sergeant Hall and Detective Davis was replete with lies, he responded, "From start to finish."

A $20 bill, along with some other unidentified money, was found in the defendant's car. Deputy Day testified that he patted down the defendant, but could not remember if he had any money on him. However, if the defendant would have had $1,000 on him or if there was $1,000 inside the car, Deputy Day would have remembered that.

(footnotes omitted) State v. McGeorge, 977 So.2d 305 (La. App. 1st Cir. 2008) (Table);

State v. McGeorge, 2008 WL 425612, at *1-3 (La. App. 1st Cir. 2008); State Record

Volume 5 of 8, Louisiana First Circuit Court of Appeal Opinion, 2007-KA-0997,

February 8, 2008.

McGeorge's counsel filed pre-trial motions to suppress the evidence, the confession and the identification evidence.[3] At the evidentiary hearing held August 25, 2005, McGeorge's counsel waived the motion to suppress the evidence, and the state trial court denied the motion to suppress the confession and declared that the motion to suppress identification evidence was not an issue at that time.[4]

McGeorge was tried before a jury on May 15 through 18, 2006, and was found guilty as charged.[5] The state trial court sentenced him on October 12, 2006, to life imprisonment without benefit of parole, probation, suspension of sentence.[6] The court also denied his motion for a new trial.[7]

On direct appeal, McGeorge's appointed counsel asserted three assignments of error: (1) The evidence was insufficient to support the verdict. (2) The trial court erred

---

[3]St. Rec. Vol. 1 of 8, Motion to Suppress Evidence, 9/16/02; Motion to Suppress the Confession, 9/16/02; Motion to Suppress the Confession, 6/23/03; Motion to Suppress the Evidence, 6/23/03; Motion to Suppress Evidence of Identification, 6/23/03. The first set of motions were filed by McGeorge's appointed indigent defender. The second set was filed by his later-enrolled trial counsel.

[4]St. Rec. Vol. 1 of 8, Minute Entry, 8/25/05; St. Rec. Vol. 2 of 8, Motion Hearing Transcript, 8/25/05.

[5]St. Rec. Vol. 1 of 8, Trial Minutes, 5/15/06; Trial Minutes, 5/16/06; Trial Minutes, 5/17/06, Trial Minutes, 5/18/06; St. Rec. Vol. 2 of 8, Verdict Form, 5/18/06; Trial Transcript, 5/15/06; St. Rec. Vol. 3 of 8, Trial Transcript, 5/16/06; Trial Transcript, 5/17/06; St. Rec. Vol. 4 of 8, Trial Transcript (continued), 5/17/06; Trial Transcript, 5/18/06.

[6]St. Rec. Vol. 1 of 8, Sentencing Minutes, 10/12/06; St. Rec. Vol. 4 of 8, Sentencing Transcript, 10/12/06.

[7]St. Rec. Vol. 1 of 8, Sentencing Minutes, 10/12/06; St. Rec. Vol. 4 of 8, Sentencing Transcript, 10/12/06; St. Rec. Vol. 2 of 8, Motion for New Trial, 10/12/06.

in denying the motion during trial to re-open the motion to suppress evidence for lack of probable cause. (3) The trial court erred in denying two motions for mistrial made during trial which were based on improper comments by the prosecutor and a state witness's reference to McGeorge's post-arrest silence.  On February 8, 2008, the Louisiana First Circuit affirmed the conviction finding no merit to the first two claims.[8]  The court also barred review of the third claim for lack of a contemporaneous objection and otherwise found it to be meritless.

McGeorge's conviction became final 30 days later, on Monday, March 10, 2008,[9] because he did not seek rehearing or file for review in the Louisiana Supreme Court. Butler v. Cain, 533 F.3d 314 (5th Cir. 2008) (citing Roberts v. Cockrell, 319 F.3d 690, 694-95 (5the Cir. 2003) (an appeal is final when the state defendant does not timely proceed to the next available step in an appeal process)).

On September 24, 2008, McGeorge's newly retained counsel filed an application for post-conviction relief asserting eleven (11) grounds for relief:[10] (1) Counsel was ineffective in waiving a hearing on the motion to suppress evidence and for waiting until trial to request a suppression hearing. (2) Counsel was ineffective in failing to secure

---

[8]State v. McGeorge, 2008 WL 425612, at *1, *9; St. Rec. Vol. 5 of 8, 1st Cir. Opinion, 2007-KA-0997, pp. 1, 18, 2/8/08.

[9]The thirtieth day was Sunday, March 9, 2008, and the deadline fell to the next business day.

[10]St. Rec. Vol. 5 of 8, Application for Post-Conviction Relief, 9/24/08.

McGeorge's employment records to impeach the State's witnesses. (3) Counsel was ineffective in failing to interview or subpoena potential witnesses James Gideon, Charles Edwards and Jamie Clark. (4) Counsel was ineffective in failing to (a) inspect evidence before trial, (b) conduct a pretrial investigation and (c) interview the State's witnesses. (5) Counsel was ineffective in failing to (a) adequately prepare for trial, (b) prepare McGeorge to testify and (c) return phone calls from McGeorge and his wife. (6) Counsel was ineffective in failing to rebut "dirt evidence" by showing the McGeorges regularly visited the property where the victim's body was found. (7) Counsel was ineffective in failing to interview or subpoena the private investigator whom counsel advised McGeorge to hire. (8) Counsel was ineffective in failing to inform McGeorge of potential plea bargain discussions. (9) Counsel was ineffective in failing to hire a psychopharmacological expert to show the effects of paranoia from drug abuse. (10) He re-raised the issues presented on direct appeal. (11) He is entitled to an evidentiary hearing.

The State filed an answer to the application arguing that all of the ineffective assistance claims were without merit.[11] The State further argued that the tenth claim was not a proper ground for post-conviction relief under La. Code Crim. P. art. 930.3 and was repetitive under La. Code Crim. P. art. 930.4. The State also argued that a request for

_____

[11]St. Rec. Vol. 5 of 8, District Attorney's Answer, 11/5/08.

evidentiary hearing was not a proper ground for post-conviction review and that the claims in the application did not warrant a hearing.

McGeorge's counsel later filed a supplement to the application requesting that the trial court consider all issues relevant to the motion to suppress in light of the United States Supreme Court's ruling in <u>Arizona v. Gant</u>, 556 U.S. 332, 129 S. Ct. 1710 (2009).[12]

On October 28, 2009, the state trial court denied the application, as supplemented, as repetitive and/or for failure to state a claim upon which relief may be granted under La. Code Crim. P. art. 930.4.[13] Citing <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the court determined that McGeorge failed to prove deficient performance and/or prejudice on any of the ineffective assistance of counsel claims. The court barred review of the tenth claim as repetitive of matters addressed on direct appeal under La. Code Crim. P. art. 930.4. The court denied the eleventh claim because there was no need for an evidentiary hearing. The court also denied the supplemental claim because the vehicle search was based on probable cause and was not incident to the arrest like the search

---

[12]St. Rec. Vol. 5 of 8, Second Supplemental Application for Post-Conviction Relief, 10/5/09. Although McGeorge labeled this a second supplement, the record does not contain proof that a first supplement was filed. In addition, the state trial court also recognized in its order that only the original and this "second" supplement were filed with the court. St. Rec. Vol. 5 of 8, Trial Court's Order, 10/28/09.

[13]St. Rec. Vol. 5 of 8, Trial Court's Order, 10/28/09.

addressed in <u>Gant</u>.[14]  The court later denied McGeorge's motion for reconsideration without reasons.[15]

McGeorge's counsel filed a writ application with the Louisiana First Circuit in which the <u>sole</u> claim raised was that the state trial court erred in denying the application for post-conviction relief without an evidentiary hearing on the ineffective assistance of counsel claims.[16]  The court denied the application on May 12, 2010.[17]

McGeorge's counsel filed a writ application with the Louisiana Supreme Court again seeking <u>only</u> review of the trial court's denial of an evidentiary hearing on the ineffective assistance of counsel claims.[18]  The court denied the application without stated reasons on February 4, 2011.[19]

_____

[14]In <u>Gant</u>, the Supreme Court held that police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest, and without these justifications, a search of an arrestee's vehicle is unreasonable, unless police obtain a warrant or show that another exception to the warrant requirement applies. <u>Gant</u>, 129 S. Ct. at 1723-24.

[15]St. Rec. Vol. 5 of 8, Motion to Reconsider, 11/6/09; Trial Court Order, 11/10/09.

[16]St. Rec. Vol. 8 of 8, 1st Cir. Writ Application, 2010-KW-0347, 2/22/10.  The Louisiana First Circuit did not consider McGeorge's first writ application, finding that the application failed to comply with certain procedural requirements.  St. Rec. Vol. 5 of 8, 1st Cir. Order, 2009-KW-2271, 2/17/10.  The court allowed supplementation to be filed by March 4, 2010, and McGeorge's counsel appears to have met that deadline with the filing of this 2010 writ application.

[17]St. Rec. Vol. 5 of 8, 1st Cir. Order, 2010-KW-0347, 5/12/10.

[18]St. Rec. Vol. 7 of 8, La. S. Ct. Writ Application, 10-KP-1349, 6/10/10; St. Rec. Vol. 5 of 8, La. S. Ct. Letter, 2010-KP-1349, 6/11/10 (showing filed by hand 6/10/10).

[19]<u>State v. McGeorge</u>, 56 So.3d 989 (La. 2011); St. Rec. Vol. 7 of 8, La. S. Ct. Order, 2010-KP-1349, 2/4/11.

II.     <u>FEDERAL HABEAS PETITION</u>

On June 28, 2011, McGeorge's counsel filed this petition for federal habeas corpus relief in which he asserts nine grounds for relief:[20] (1) Counsel was ineffective in failing adequately to investigate the case, including failure to impeach the State's witnesses and secure impeachment evidence to rebut the State's case. (2) Counsel was ineffective in failing to communicate with McGeorge regarding trial testimony, including preparing McGeorge to testify at trial. (3) Counsel was ineffective in failing to communicate with the private investigator hired to assist in the case. (4) Counsel was ineffective in failing to assert a valid mitigation defense. (5) Counsel was ineffective in failing to challenge the State's expert witness. (6) Counsel was ineffective in waiving the pretrial motion to suppress evidence. (7) The State failed to prove that McGeorge did not act in self-defense. (8) McGeorge was denied effective assistance of counsel based on the cumulative errors committed by his trial counsel. (9) Claims raised on direct appeal were presented for post-conviction relief in the interest of justice, pursuant to La. Code Crim. P. art. 930.4, ensuring exhaustion of their review.

In his supporting memorandum, McGeorge expanded the ninth claim to include three errors raised on direct appeal: (a) The evidence was insufficient to support the verdict. (b) The state trial court erred in denying his motion to re-open the motion to

_____

[20]Rec. Doc. No. 1, p.10.

suppress the evidence. (c) The state trial court erred in denying the motions for mistrial based on (i) the prosecutor's reference to waiver of the motion to suppress and (ii) a State witness's reference to McGeorge's post-arrest silence.

The State filed a response in opposition to McGeorge's petition conceding timeliness and suggesting that McGeorge's claims "may be" exhausted because he filed for review in each level of the state courts.[21] The State further argues that McGeorge's claims are without merit.

III.    GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") went into effect on April 24, 1996[22] and applies to habeas petitions filed after that date. Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)). The AEDPA therefore applies to McGeorge's petition, which was filed by counsel in this federal court on June 28, 2011.

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and

_____

[21]Rec. Doc. Nos. 10, 11.

[22]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

must not be in "procedural default" on a claim.  <u>Nobles v. Johnson</u>, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

In this case, the State concedes, and I find, that McGeorge's federal petition was timely filed.  I disagree with the State's conclusion that the claims presented in this court were exhausted through the state courts.  In addition, the State failed to address whether the procedural bar prohibits review of one of McGeorge's post-conviction claims in which he re-urged the claims raised on direct appeal.

I find that McGeorge did not exhaust any of the claims raised in his post-conviction application (or on direct appeal), except for his request for an evidentiary hearing, which is not a cognizable federal habeas claim and is not included in his petition in this court. As outlined above, after the state trial court denied his post-conviction application, McGeorge sought review in both the Louisiana First Circuit and the Louisiana Supreme Court <u>only</u> as to one issue:  whether the trial court erred in denying his post-conviction application without an evidentiary hearing on the ineffective assistance of counsel claims.  His failure to raise each of the substantive post-conviction claims now before this federal court in a procedurally proper manner at each level of the Louisiana courts renders the claims unexhausted.  <u>See</u> <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999); <u>Baldwin v. Reese</u>, 541 U.S. 27, 32 (2004).

The State's response in opposition did not address procedural default.  The state appellate court on direct appeal held that McGeorge procedurally defaulted the issue of

the state trial court's denial of his motion for mistrial based on a witness's comment on McGeorge's post-arrest silence. The state trial court also later barred review of McGeorge's post-conviction claim in which he sought to re-urge the three claims raised on direct appeal and for which he did seek further review from the Louisiana Supreme Court, pursuant to La. Code Crim. P. art. 930.4(A) as repetitive of matters raised on appeal.

The record indicates that, on direct appeal, McGeorge's counsel raised three claims, insufficient evidence, denial of motion to re-open the motion suppress and denial of the motions for mistrial. The Louisiana First Circuit denied the first two claims as meritless. It found part of the third meritless and the remainder procedurally barred for lack of a contemporaneous objection and alternatively meritless. McGeorge did not seek review of that ruling in the Louisiana Supreme Court. Later, his post-conviction counsel sought to reurge the claims "in the interest of justice . . . ensuring exhaustion of their review."[23] The state trial court barred review of the claims under La. Code Crim. P. art. 930.4(A), which bars repetitive post-conviction review of claims already raised on direct appeal.

Under Louisiana law, Article 930.4(A) precludes post-conviction review of claims already "fully litigated" on direct appeal. <u>Bennett v. Whitley</u>, 41 F.3d 1581 (5th Cir.

---

[23]Rec. Doc. No. 1, p. 11, Claim No. 9.

13

1994).  This rule presumes that the claims have been fully reviewed by the state appellate court on direct appeal and by the Louisiana Supreme court and need not be considered again on post-conviction application.  Id.  In this case, McGeorge did not fully litigate his three appellate claims since they were never presented to the Louisiana Supreme Court on direct appeal or in proceedings.  They also were not raised to the Louisiana Supreme Court on post-conviction since his only claim there related to the denial of an evidentiary hearing on the ineffective assistance claims.  Even if he had raised the claims to that court on post-conviction, it would not have been in a procedurally proper manner since the claims were already barred from review by the lower state courts under La. Code Crim. P. art. 930.4.

In its response in this court, the State failed to mention or recognize these procedural issues, including lack of exhaustion.  Nevertheless, because McGeorge's claims are clearly without merit, and dismissal of this petition without prejudice for their presentation in state court would serve no useful purpose, I will not address the procedural defaults or lack of exhaustion sua sponte.  Instead, I address the substance of the claims themselves as follows.  28 U.S.C. § 2254(b)(2).

IV.    MERITS REVIEW

The AEDPA standard of review is governed by Section 2254(d) and the Supreme Court's decision in Williams v. Taylor, 529 U.S. 362 (2000).  It provides different standards for questions of fact, questions of law, and mixed questions of fact and law. The AEDPA's deferential standard of review applies only to claims adjudicated on the merits by the state courts.  28 U.S.C. § 2254(d).

As mentioned previously, however, McGeorge did not exhaust or fully adjudicate his claims in the Louisiana state courts.  With respect to claims that are not fully adjudicated on the merits in state court, the deferential AEDPA standards of review do not apply.  Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388, 1401 (2011); Henderson v. Cockrell, 333 F.3d 592, 597 (5th Cir. 2003).  Instead, the federal courts review those claims under the pre-AEDPA de novo standards of review.  Id. at 598 (citing Jones v. Jones, 163 F.3d 285, 299-300 (5th Cir. 1998) (applying de novo standard of review to ineffective assistance of counsel claims that were raised in state court, but not adjudicated on the merits)); Carty v. Thaler, 583 F.3d 244, 253 (5th Cir. 2009).  Thus, I consider McGeorge's claims de novo.

V.    SUFFICIENCY OF THE EVIDENCE (CLAIM NO. 9(A))

McGeorge alleges that the State's evidence did not rebut the direct evidence that he acted in self-defense.  He argues that, based on evidence of the victim's violent nature and McGeorge's justification testimony, the jury's verdict was not rational.

Under Jackson v. Virginia, 443 U.S. 307 (1979), this court must determine, after viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. Id., 443 U.S. at 319; Perez v. Cain, 529 F.3d 588, 594 (5th Cir. 2008); Williams v. Cain, 408 Fed. Appx. 817, 821 (5th Cir. 2011). Thus, to determine whether commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law. Perez, 529 F.3d at 594 (citing Jackson, 443 U. S. at 324 n. 16). The court's consideration of the sufficiency of the evidence extends only to what was presented at trial. See McDaniel v. Brown, __ U.S. __, 130 S.Ct. 665, 672, 674 (2010) (recognizing that a reviewing court is to consider the trial evidence as a whole under Jackson); Johnson v. Cain, 347 Fed. Appx. 89, 91 (5th Cir. 2009) (Jackson standard relies "upon the record evidence adduced at the trial.") (quoting Jackson, 443 U.S. at 324).

Review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury. United States v. Young, 107 Fed. Appx. 442, 443 (5th Cir. 2004) (citing United States v. Garcia, 995 F.2d 556, 561 (5th Cir. 1993); see also Jackson, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). Thus, all credibility choices and

conflicting inferences must be resolved in favor of the verdict. <u>Ramirez v. Dretke</u>, 398 F.3d 691, 695 (5th Cir. 2005).

A reviewing federal habeas court is <u>not</u> authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses for that of the fact-finder. <u>Alexander v. McCotter</u>, 775 F.2d 595, 598 (5th Cir. 1985). In addition, "[t]he <u>Jackson</u> inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'" <u>Santellan v. Cockrell</u>, 271 F.3d 190, 193 (5th Cir. 2001) (quoting <u>Herrera v. Collins</u>, 506 U.S. 390, 402 (1993)).

McGeorge was charged with and convicted of second degree murder, which is defined in relevant part by Louisiana law as follows:[24]

A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, . . . simple robbery . . . even though he has no intent to kill or to inflict great bodily harm.

La. Rev. Stat. Ann. § 14:30(A).

_____

[24]This also is the definition used to charge the jury. St. Rec. Vol. 4 of 8, Trial Transcript, p. 149, 5/18/06.

The phrase "specific intent" is defined as the state of mind in which the perpetrator "actively desired the prescribed criminal consequences to follow his act or failure to act." La. Rev. Stat. Ann. § 14:10(1). Under Louisiana law, intent need not be proven directly but may be inferred from the actions of the defendant and the circumstances surrounding those actions. State v. Sharlhorne, 554 So.2d 1317, 1321 (La. App. 1st Cir. 1989); State v. Tate, 851 So.2d 921, 930 (La. 2003) (citing State v. Brooks, 505 So.2d 714, 717 (La. 1987)). Specific intent to kill can be implied by the intentional use of a deadly weapon, such as a knife or a gun. State v. Collins, 43 So.3d 244, 251 (La. App. 1st Cir.) (citing State v. Brunet, 674 So.2d 344, 349 (1996)).

The jury heard the testimony of Daniel Prats, the man who found Certain's body on his property after the murder.[25] Prats had returned to live on his family's property in 2000, and he testified that he had no recollection of McGeorge ever being on the property since he moved home.[26]

The jury also heard the testimony of Maureen Boutrell, a geologist forensic examiner with the FBI, who testified that dirt and debris collected from McGeorge's car

---

[25]St. Rec. Vol. 3 of 8, Trial Transcript, p. 64, 5/16/06.

[26]Id., pp. 69-70.

came from the same location where the body was found.[27]  The blood in McGeorge's car also was linked to Certain by the reports presented by the DNA expert, Joanie Wilson.[28]

Concerning the shooting, the jury heard the testimony of Dr. Michael Defatta, chief deputy coroner and forensic pathologist for St. Tammany Parish.[29]  Dr. Defatta testified that the autopsy revealed a bullet hole in the left temple of the victim's head, with no exit wound.[30]  He recovered a small caliber projectile from the inside wall of the bottom portion of the skull.[31]  Although the body was in a stage of advanced decomposition, the autopsy did not reveal any fractures to the skull.[32]  There was no evidence of other trauma to the skull.[33]  The toxicology reports were negative for all drugs.[34]

---

[27]Id., pp. 117, 121.

[28]Id., pp. 122, 134, 135.

[29]Id., p. 71.

[30]Id., p. 80.

[31]Id., p. 87.

[32]Id., pp. 81, 74-75.

[33]Id., pp. 82, 85.

[34]Id., p. 86.

The jury also heard the testimony of Dustin Day, a former St. Tammany Parish Sheriff's Deputy.[35] He testified that, around 8:30 p.m. on June 9, 2002, he was dispatched on a call of a suspicious person in Covington and found a man with a hose who appeared to be washing his white car.[36] As he spoke with McGeorge, he noticed that the floorboard of the passenger side of the car was covered in reddish-colored water, along with a hammer.[37] McGeorge told the deputy that he had spilled food in the car, and he was trying to clean it.[38] Initially, McGeorge told the officer he had broken a ketchup packet. He then changed his story to say that jelly had spilled.[39] When Charles Edwards, a resident on the property who apparently knew McGeorge, arrived at the scene, the two men spoke, Edwards called McGeorge's wife, and she arrived a short time later.

In the meantime, Day called his supervisor, Sergeant Mike Farrell, to the scene.[40] When Mrs. McGeorge arrived, she and McGeorge spoke out of his hearing.[41] The deputy

---

[35]St. Rec. Vol. 4 of 8, Trial Transcript (continued), p. 71, 5/17/06.

[36]Id., pp. 73, 75.

[37]Id., p. 75.

[38]Id., p. 76.

[39]Id., p. 77.

[40]Id., pp. 77-78, 81.

[41]Id., p. 78.

did not hear McGeorge ask his wife to get him a lawyer.[42]  McGeorge then approached

him and advised Day that he wished to change his story.  He told Day that he tried to buy

drugs from his drug dealer in Abita Nursery Subdivision, and the drug dealer got in the

car and tried to rob him.  McGeorge claimed that he hit the man in the head with a

hammer.[43]  Day stopped McGeorge and read him his <u>Miranda</u> rights.[44]  McGeorge then

told Day that the man pulled a gun on him and tried to rob him. He grabbed a three pound

maul and hit the man a couple of times in the head.  He told Day that he then pushed the

man out of the car on Nursery Street and drove off.  At that point, Day turned the scene

over to his supervisor.[45]  As crime lab personnel arrived, he and other officers searched

the neighborhood but did not locate the victim.[46]

McGeorge's wife testified that McGeorge had an on-and-off problem with drugs.[47]

She had asked him on Saturday, June 8, 2002, to move out of the house, because his drug

use had escalated.[48]  She recalled being called to a scene on June 9, 2002, where the

police were questioning her husband about her white Chrysler.  She and one of the

---

[42]<u>Id</u>., p. 84.

[43]<u>Id</u>., pp. 78-79.

[44]<u>Id</u>., p. 79.

[45]<u>Id</u>., p. 80.

[46]<u>Id</u>., pp. 81, 82.

[47]<u>Id</u>., p. 59.

[48]<u>Id</u>., p. 61.

officers spoke with McGeorge and asked him what happened. Mrs. McGeorge recalled that either she or the officer asked him if he had used the hammer in the car to hit "the guy."[49] McGeorge answered "yes," then asked her to get him a lawyer.[50] Mrs. McGeorge said that she continued to ask her husband questions about the incident, as the officer stood nearby. McGeorge told her that he needed a lawyer, and they began to argue. She did not know what happened after that, because the officer separated them, except that the officers placed her husband in the back of a police car and told her he was being held for questioning.[51]

Harold Morgan, McGeorge's former work supervisor, also testified before the jury.[52] Morgan explained that McGeorge missed work on the Monday after the murder.[53] When he returned late on Tuesday, he told Morgan and the other workers that he had been the victim of an attempted car-jacking.[54] He told the men that he hit the perpetrator in the face with a chipping hammer. Morgan's office eventually received a telephone call

---

[49]Id., p. 62.

[50]Id., p. 63.

[51]Id., p. 64.

[52]St. Rec. Vol. 3 of 8, Trial Transcript, p. 96, 5/16/06.

[53]Id., p. 97.

[54]Id., p. 98.

from police investigators, who also spoke with McGeorge.[55] McGeorge eventually received a second call, which made him act nervously.[56] McGeorge left work and later returned to talk with Morgan.[57] He told Morgan that the alleged car-jacker had died.[58] Morgan also recalled that McGeorge changed his story to indicate that both he and the car-jacker had guns.[59]

Detectives Dale Galloway and Jerry Hall testified that they were assigned to investigate the case.[60] Hall was present when Sergeant Davis interviewed McGeorge about the incident.[61] McGeorge was read his rights and signed a waiver of rights form, and the interview was recorded.[62] That statement was later played for the jury.[63] After the statement was taken, the officers accompanied McGeorge to the scene of the

---

[55]Id., p. 100.

[56]Id., p. 101.

[57]Id., p. 102.

[58]Id., p. 103.

[59]Id., pp. 99-100, 103.

[60]St. Rec. Vol. 3 of 8, Trial Transcript, p. 43 (Galloway), 5/17/06; St. Rec. Vol. 4 of 8, Trial Transcript (continued), p. 87 (Hall), 5/17/06.

[61]St. Rec. Vol. 4 of 8, Trial Transcript (continued), p. 88, 5/17/06.

[62]Id., p. 89.

[63]Id., pp. 93-98.

incident.[64]   McGeorge was not arrested and was released that night.[65]   Hall obtained

warrants to seize the car and search it for evidence, including the hammer.[66]   During the

investigation, the officers received a report that Darnell Certain was missing.[67]

The officers learned from Sherome and Sheronda Green that Certain was last seen

with McGeorge when McGeorge picked him up at his home driving a Chrysler.[68]   Certain

was carrying about $1,000 in his pocket and drugs in his pants.[69]   Hall then obtained an

arrest warrant for McGeorge, who was working on a crane on a barge at the time.[70]   As

Hall and Galloway traveled to see McGeorge in Port Fourchon, they received a call that

Certain's body had been found.[71]   When the two officers arrived, McGeorge had figured

out that they had found the body.[72]   They read him his rights and took him into custody.

---

[64]Id., p. 99.

[65]Id., pp. 101-02.

[66]Id., pp. 103, 107-09.

[67]Id., p. 111.

[68]Id., p. 110-11; St. Rec. Vol. 3 of 8, Trial Transcript, p.13 (Sheronda Green), p. 29 (Sherome Green), 5/17/06.

[69]Id., pp. 33-34.

[70]St. Rec. Vol. 3 of 8, Trial Transcript (continued), p. 113, 5/16/06.

[71]Id., p. 114.

[72]Id., pp. 115-16.

The officers also later seized and searched his truck from which they retrieved two live .22 caliber bullets and a BB-gun.[73]

The officers obtained a search warrant for McGeorge's residence.[74] Mrs. McGeorge told the officers at the house about a gun she had owned for 30 to 35 years.[75] The revolver was not in the box where Mrs. McGeorge told the officers it would be.[76] The officers found a box of .22 caliber ammunition.

McGeorge testified at trial on his own behalf.[77] He testified that in 1988, while working in California, he suffered a work related injury to his head, neck and shoulders. He was prescribed pain medication, including Demerol, Lortab, Lorcet and Percocet, for about 18 months.[78] After his prescriptions ran out, he began buying drugs on the street to control the pain.[79] After 1995, he began buying illegal medication more often and eventually switched to buying cocaine on occasion.[80] Later in 1999 or 2000, he was car-jacked and beaten while trying to buy drugs in Alabama, after which he began carrying

---

[73]Id., p. 118.

[74]St. Rec. Vol. 3 of 8, Trial Transcript (continued), p. 44 (Gallaway), 5/17/06.

[75]Id., p. 46.

[76]Id., p. 47.

[77]St. Rec. Vol. 4 of 8, Trial Transcript, p. 36, 5/18/06.

[78]Id., p. 39.

[79]Id., p. 40.

[80]Id., pp. 41-42.

his wife's heirloom .22 caliber pistol without her knowledge.[81] McGeorge testified that in January 2002, he became ill with pneumonia which caused severe back pain. The doctor prescribed pain medication, including dilaudid.[82] He eventually started buying and using dilaudid, oxycontin, and cocaine on the streets.[83] He met Darnell Certain while buying drugs in 2001.[84]

He told the jury that, after he left work on Saturday, June 8, 2002, he purchased oxycontin from a dealer in the Covington area.[85] Later that day, he went to Certain's house to buy $50 worth of crack cocaine. He also gave Certain a ride to and from Abita Springs.[86]

The next evening, on Sunday, June 9, 2002, McGeorge returned to Certain's house to buy crack cocaine.[87] Certain told him that he did not have any, so they left together to drive around to find some. After a couple of stops, the two men headed to Abita

---

[81]Id., pp. 42-43, 44.

[82]Id., p. 45.

[83]Id., p. 46.

[84]Id., p. 47.

[85]Id., p. 48.

[86]Id., p. 49.

[87]Id., p. 52.

Springs.[88]  When they reached a stop sign, Certain asked McGeorge for his money. McGeorge testified that he gave him a $50 bill and two $20 bills.  He testified that Certain then looked at him and told him to give him the rest of his money or "I'll pop a cap in your ass."[89]  McGeorge said he told Certain that he only wanted to spend what he had given him already.  McGeorge stated that Certain told him to empty his pockets or he would kill him.  McGeorge indicated that, at that time, Certain reached around his side as if to pull a weapon.  McGeorge then pulled out his pistol and shot Certain.  The windows were up and the doors were closed.

McGeorge decided to take Certain's body to the Prats' property.  He pulled Certain out of the car and dragged him down the road, where he left the body.[90] McGeorge stated that he did not take anything from Certain when he left the body.[91]  He also discovered that Certain did not have a gun.[92]  He threw his wife's pistol from the car as he drove down the highway back to Covington.

---

[88]Id., p. 53.

[89]Id., p. 54.

[90]Id., p. 56.

[91]Id., p. 57.

[92]Id., p. 58.

Afterwards, McGeorge drove to his friend J.J. Canatella's house to get advice.[93] When he arrived, Canatella was not home, and he got towels from Canatella's roommate so he could clean out his car. He also had some oxycontin and gave himself a shot of that because he felt anxious and scared.[94]

McGeorge recalled telling a police officer that his son stepped on ketchup packets in the car, which he admitted was a lie. Another of Canatella's roommates showed up and called McGeorge's wife for him.[95] When she arrived, the deputy spoke to her and showed her the blood splatter in the car. When his wife and the officer approached him, McGeorge recalled that he told his wife a couple of times that he needed a lawyer.[96] He presumed that the officer heard. His wife insisted that he tell the police what happened.

The officer had asked him general questions up to the time his wife arrived. After his wife walked away, McGeorge approached the officer, who was standing next to the car.[97] He told the officer he wanted to tell him what happened. The officer asked if he hit someone with the hammer. McGeorge said he decided that sounded better than the truth.

---

[93]Id., p. 59.

[94]Id., p. 60.

[95]Id., p. 61.

[96]Id., p. 62.

[97]Id., p. 63.

McGeorge recalled lying to the police in his statement later that night, after which he was released.[98]  When he reported to work on the Tuesday after the murder, he eventually told his supervisor, Harold Morgan, what happened.[99]  This was before he found out that the police had found the body.  He eventually spoke with a lawyer who had represented him in other criminal matters.[100]  When the police arrested him and read him his rights, he told them he had counsel and was advised to remain silent.[101]

On cross-examination, the State asked McGeorge about his claim of self-defense. McGeorge conceded that he lied about the hammer and did not tell anyone about the gun until much later.[102]  He also acknowledged that he told the officers that he had no fears about being in the Abita Subdivision and that he had not had an argument with the man in his car.[103]

The jury obviously found credible the evidence demonstrating that McGeorge acted with specific intent to kill or commit great bodily harm when he shot Certain at close range in a closed car during a drug deal.  McGeorge's testimony clearly indicated

---

[98]Id., pp. 64-65.

[99]Id., p. 66.

[100]Id., pp. 66-67.

[101]Id., p. 67.

[102]Id., pp. 79-80.

[103]Id., pp. 80-81.

that he pulled the trigger at close range in the car with the windows and doors closed. He also established by his own testimony that Certain was not armed when the shooting happened.

The evidence was sufficient for the jury to reject McGeorge's self-defense argument. Louisiana law provides that a homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. Rev. Stat. Ann. § 14:20(1). However, a person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense, unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. Rev. Stat. Ann. § 14:21. While there is no requirement that the defendant must actually retreat from the confrontation, the possibility of escape is a factor to be considered in determining if the defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. State v. Woodhead, 866 So.2d 995, 1000 (La. App. 5th Cir. 2004).

Under Louisiana law, the burden of proof is on the State to prove that a murder was not committed in self-defense:

> [W]hen an accused raises self-defense, the burden is on the State to prove, beyond a reasonable doubt, that he did not act in self-defense. "The determination of a defendant's culpability focuses on a two fold inquiry: 1) whether, from the facts presented, the defendant could have reasonably believed his life to be in imminent danger, and 2) whether deadly force was

necessary to prevent the danger." State v. Mills, 04-489, p. 7 (La. App. 5 Cir. 3/29/05), 900 So.2d 953, 959, writ denied, 05-1470 (La.1/13/06), 920 So.2d 235. "Factors to consider in determining whether a defendant had a reasonable belief the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing and the Defendant's knowledge of the assailant's bad character." State v. Nelson, 34,077, p. 6 (La. App. 2 Cir. 12/6/00), 775 So.2d 579, 584.

State v. Johnson, 948 So.2d 1229, 1234 (La. App. 3rd Cir.), writs denied, 965 So.2d 398, 399 (La. 2007).

McGeorge consistently testified at trial that he had an on-going relationship with Certain and had no trouble or argument with him in the past. He had not seen a gun on Certain, and investigation after the shooting determined that Certain did not have a gun. The jury considered McGeorge's self-serving testimony that he felt threatened by Certain's words and actions in the car. This was, of course, inconsistent with his prior statements to police and was not something he conveyed to police until after the victim's body was located. Thus, the jury reasonably found McGeorge's self-defense testimony lacking in weight and/or credibility.

In rebutting self-defense, the State established through McGeorge's own testimony a non-antagonistic relationship between him and Certain. McGeorge testified that he threw away the gun and sought first to hide the body and clean out the car after getting high. He made no effort to report the incident, and when caught, he lied to police. On questioning by the State, McGeorge conceded that he did not try to push Certain out of the car or do anything short of pulling the trigger to escape the situation.

A jury could reasonably find that McGeorge did not act in self-defense based on his actions. Contrary to McGeorge's testimony, the State's witnesses testified that no money or drugs were recovered from Certain's body, not even the $90 McGeorge claimed to have given him. The jury reasonably could have accepted this to disprove McGeorge's self-serving testimony that he panicked and dumped the body without taking anything back from Certain. The jury's credibility determinations regarding his testimony of fear and apprehension during the incident are not subject to second-guessing. Those determinations, however, appear reasonable in light of McGeorge's continued (and admitted) lies to police and his hesitancy to report the true basis of his actions, even in self-defense.

The record as a whole contains more than sufficient evidence from which the State cast doubt on McGeorge's version of the incident and his allegation of self-defense. The evidence was more than sufficient for a reasonable jury to conclude that McGeorge acted with specific intent to kill or commit great bodily harm and to support the verdict of second degree murder. McGeorge is not entitled to relief on this claim.

## VI.  DENIAL OF MOTION TO RE-OPEN (CLAIM NO. 9(B))

McGeorge argues that, when his counsel at trial was shown photographs of the car which he allegedly had not previously seen, the trial court erred in denying his request to re-open a previously waived motion to suppress. He argues that the trial court denied the motion to re-open, because counsel was given open-file discovery by the State which

foreclosed the issue. McGeorge argues here that "the trial court erred in failing to reopen the motion to suppress evidence. The trial court did not consider at what point in time the photographs were made part of the State's file and, therefore, abused its discretion in denying the defendant's request to re-open the hearing."[104] Thus, the sole challenge brought to this court is that the state trial court failed to determine when the pictures were added to the State's files before denying the motion to re-open. In addressing the claim on direct appeal, the Louisiana First Circuit denied relief, finding that the denial of the motion to re-open was not an abuse of discretion under state law.

It is not "the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). A federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law." Wilkerson v. Whitley, 16 F.3d 64, 67 (5th Cir. 1994) (quotation omitted); see also Swarthout v. Cooke, __ U.S. __, 131 S. Ct. 859, 861 (2011) (federal habeas review does not lie for errors of state law). This court's analysis must focus instead on due process considerations, and due process requires that the court grant habeas relief only when the errors of the state court make the underlying proceeding

---

[104]Rec. Doc. No. 1, p. 23.

fundamentally unfair. Neyland v. Blackburn, 785 F.2d 1283, 1293 (5th Cir. 1986). McGeorge has made no such argument to this court.

To whatever extent, if any, this argument is intended to prompt review of the underlying Fourth Amendment claim, such review is not appropriate in this court. Fourth Amendment violations are generally not cognizable on federal habeas review. Stone v. Powell, 428 U.S. 465 (1976). In Stone, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial." (footnotes omitted) Id., at 494. A "full and fair" hearing as contemplated by Stone refers to thoughtful consideration by the factfinder and at least the availability of meaningful appellate review by a higher state court. Davis v. Blackburn, 803 F.2d 807, 808 (5th Cir.1986); O'Berry v. Wainwright, 546 F.2d 1204, 1213 (5th Cir. 1977).

The United States Court of Appeals for the Fifth Circuit has interpreted an "opportunity for full and fair litigation" to mean just that, "an opportunity." Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir. 1978); Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002), cert. denied, 537 U.S. 1196 (2003). "If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, Stone bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes." Caver, 577 F.2d at 1192.

Thus, it is the opportunity to present a Fourth Amendment claim to the state courts that is the basis of the <u>Stone</u> prohibition, without regard for whether that opportunity is actually exercised or is unsuccessful. <u>Janecka</u>, 301 F.3d at 320-21. Even if a defendant fails to take advantage of the opportunity to litigate a motion to suppress or assert Fourth Amendment claims, the fact that the opportunity existed suffices for the <u>Stone</u> bar to apply. <u>Id.</u>, at 320. The Fifth Circuit has also held that the <u>Stone</u> bar applies despite an error by the state court in deciding the merits of the Fourth Amendment claim. <u>Swicegood v. Alabama</u>, 577 F.2d 1322, 1324-1325 (5th Cir. 1978). "[I]n the absence of allegations that the processes provided by a state to fully and fairly litigate fourth amendment claims are routinely or systematically applied in such a way to prevent the actual litigation of fourth amendment claims on the merits, the rationale of <u>Caver</u> dictates that <u>Swicegood</u>'s application of <u>Stone</u> despite a mistake in adjudicating the merits must apply with equal force to procedural mistakes that thwart the presentation of fourth amendment claims." <u>Williams v. Brown</u>, 609 F.2d 216, 220 (5th Cir. 1980); <u>see also</u>, <u>Janecka</u>, 301 F.3d at 321 (same).

To obtain post-conviction relief in federal court, a habeas petitioner must plead and prove that the state court proceeding was inadequate. <u>Davis</u>, 803 F.2d at 1372. McGeorge does not allege or demonstrate that Louisiana state courts routinely or systematically preclude litigation of a defendant's Fourth Amendment claims. Moreover, this court has found that "[i]t is beyond cavil that Louisiana courts provide criminal

defendants the opportunity to raise Fourth Amendment claims." <u>Bailey v. Cain</u>, No. 06-839, 2007 WL 1198911, at *13 (E.D. La. Apr. 20, 2007) ( Duval, J.) (order adopting referenced Report and Recommendation).

The record in this case demonstrates that McGeorge had several opportunities to litigate his challenges and was in fact provided review of his Fourth Amendment claim on direct appeal. The Louisiana First Circuit found in the alternative that there was probable cause to support the search of the car without a warrant.[105] He did not pursue further review of that ruling until his post-conviction application, which review was barred.

The record demonstrates that McGeorge was provided with ample <u>opportunity</u> to present his claims, although his efforts were unsuccessful and perhaps procedurally faulty. The state courts were not required by the Constitution to conduct in-court hearings on his Fourth Amendment claims for due process standards to have been met and for the <u>Stone</u> bar to apply. <u>See</u> <u>Woodard v. Thaler</u>, 702 F. Supp.2d 738, 759 (S.D. Tex. 2010) (state courts' finding that Fourth Amendment claim was procedurally barred did not undermine the "opportunity for full and fair litigation."); <u>Williams v. Brown</u>, 609 F.2d at 220.

---

[105]<u>State v. McGeorge</u>, 2008 WL 425612, at *6; St. Rec. Vol. 5 of 8, 1st Cir. Opinion, 2007-KA-0997, p. 14, 2/8/08.

Thus, to the extent McGeorge seeks to have this federal habeas court review his Fourth Amendment claims, he is not entitled to relief. Because he had the opportunity for a full and fair hearing in the state courts, <u>Stone</u> bars consideration of his Fourth Amendment claims here.

VII.    <u>DENIAL OF MOTIONS FOR MISTRIAL (CLAIM NO. 9(C))</u>

McGeorge argues that the state trial court erred in denying his motions for mistrial based on the State's reference to the waiver of the motion to suppress and a State witness's reference to McGeorge's post-arrest silence. McGeorge alleges that, based on the circumstantial evidence and a lack of evidence to rebut his self-defense argument, the comments were prejudicial and warranted a mistrial under La. Code Crim. P. art. 771.

In this court, McGeorge's claim is that the state trial court erred in denying the motions for mistrial. The referenced standards for granting a mistrial are under state law, which does not involve consideration of any questions of federal or constitutional law, and review of such claims is not proper on habeas review. <u>See</u> <u>Lavernia v. Lynaugh</u>, 845 F.2d 493, 496 (5th Cir. 1988) (the failure to grant a mistrial is a matter of state law and not one of a constitutional dimension); <u>Haygood v. Quarterman</u>, 239 Fed. Appx. 39, 42 (5th Cir. Jun.14, 2007) (state court's denial of a motion for a new trial does not necessarily constitute a violation of a federal constitutional right) (citing <u>Dickerson v. Guste</u>, 932 F.2d 1142, 1145 (5th Cir.1991)). As discussed above, federal habeas corpus review is limited to questions of federal constitutional dimension, and federal courts do

not review alleged errors in the application of state law.  See Swarthout, 131 S. Ct. at 861 (federal habeas review does not lie for errors of or in applying state law); Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998) (quoting Estelle, 502 at 67-68 and Lewis v. Jeffers, 497 U.S. 764, 780 (1990), and citing West v. Johnson, 92 F.3d 1385, 1404 (5th Cir. 1996)); accord Turner v. Johnson, 46 F. Supp.2d 655, 674 (S.D. Tex. 1999).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  Estelle, 502 U.S. at 67-68; see also, Molo v. Johnson, 207 F.3d 773, 776 n.9 (5th Cir. 2000) ("Federal habeas review does not extend to state court conclusions of state law."); Hogue v. Johnson, 131 F.3d 466, 506 (5th Cir. 1997) (a disagreement as to state law is not cognizable on federal habeas review).

Because McGeorge argues that the state trial court abused its discretion under state law in denying the motions for mistrial, his claim does not warrant federal habeas review or relief.

Furthermore, McGeorge has failed to establish a violation of any constitutional right arising from the prosecutor's comment or the witnesses' testimony to warrant federal habeas corpus relief.  His first mistrial motion was based on the prosecutor's objection made during the testimony of Sergeant Susan Downey, who collected evidence and photographed the car when McGeorge was first encountered by police while washing the victim's blood from his wife's car.  Defense counsel repeatedly questioned Sergeant Downey about the collection of evidence from the car without a warrant.  At one point,

the prosecuting attorney made the following objection: "Judge, at this time I'm going to object to this line of questioning. I think the Motion to Suppress Evidence is waived."[106]

Defense counsel thereafter moved the court for mistrial because the prosecutor mentioned before the jury that the defense had waived the motion to suppress.[107] He argued that it was a comment about the evidence that did not concern the jury. The state trial court determined that the comment was not so prejudicial as to warrant a mistrial and that a curative instruction was unnecessary.[108] In addressing the matter on direct appeal, the Louisiana First Circuit found that the vague reference to a motion to suppress was not particularly pertinent to the trial or damaging to the defense case such as to deprive McGeorge of a fair trial.[109]

A prosecutor's comment does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial that the state court trial was rendered fundamentally unfair in violation of due process. Jones v. Butler, 864 F.2d 348, 356 (5th Cir.1988). Due process requires reversal when the prosecutor's argument or comments "so infect the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986); Rogers v. Lynaugh, 848

---

[106]St. Rec. Vol. 3 of 8, Trial Transcript, p. 176, 5/16/06.

[107]Id., pp. 177-78.

[108]Id., p. 179.

[109]State v. McGeorge, 2008 WL 425612, at *7; St. Rec. Vol. 5 of 8, 1st Cir. Opinion, 2007-KA-0997, p. 16, 2/8/08.

F.2d 606, 608 (5th Cir. 1988); Bell v. Lynaugh, 828 F.2d 1085, 1095 (5th Cir. 1987). The prosecutor's remarks must be evaluated in the context of the entire trial. Greer v. Miller, 483 U.S. 756, 765-66 (1987) (citing Darden, 477 U.S. at 179); Kirkpatrick v. Blackburn, 777 F.2d 272, 281 (5th Cir. 1985). "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.' The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden, 477 U.S. at 181 (citations and quotations omitted).

In the Fifth Circuit, courts must apply a two-step analysis in reviewing claims of prosecutorial misconduct. See United States v. Wise, 221 F.3d 140, 152 (5th Cir. 2000); United States v. Lankford, 196 F.3d 563, 574 (5th Cir. 1999). First, the court must determine whether the prosecutor made an improper remark. Wise, 221 F.3d at 152. "If an improper remark was made, the second step is to evaluate whether the remark affected the substantial rights of the defendant." Id.

To do so, a petitioner "must demonstrate that the misconduct [was] persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks." Jones v. Butler, 864 F.2d at 356; Hogue v. Scott, 874 F. Supp. 1486, 1533 (N.D. Tex. 1994). Under this test, a petitioner must demonstrate that the comment rendered his trial "fundamentally unfair," by

showing "a reasonable probability that the verdict might have been different had the trial been properly conducted." Rogers, 848 F.2d at 609 (footnote and citations omitted).

McGeorge takes exception to the prosecutor's reference to the waived motion to suppress in making his objection to defense counsel's line of questioning. Although the comment was made in front of the jury, it was not made in argument directed to the jury. There was no extended discussion or explanation of the point. The record certainly does not show pervasive or repeated comments that could have infected the trial as required to prove a due process violation, especially in light of the overwhelming evidence of McGeorge's guilt, including his own inculpatory actions and statements. McGeorge has fallen well short of proving that the comment by the prosecutor had an impact on the verdict. He is not entitled to relief on this claim.

The second motion for mistrial was made after testimony by Sergeant Hall explaining the officers' encounter with McGeorge in Port Fourchon after discovering the victim's body. The sergeant testified that, as police approached, McGeorge asked them how they knew or how they were able to find the body.[110] The sergeant testified that he immediately stopped McGeorge before he said anything else and again read him his

---

[110]St. Rec. Vol. 4 of 8, Trial Transcript (continued), pp. 115-16, 5/17/06.

constitutional rights.[111]  The following exchange took place between the prosecutor and

Sergeant Hall:[112]

> Q.    After informing Mr. McGeorge once again of his rights, did he make any formal statement?
>
> A.    I sat him in the back of our car.  I just told you he was sweating.  I said, [c]alm down, calm down, we'll talk about it.  Here's your rights.  Just calm down, I want you to understand what's going on and we'll talk about it.  He said, "No, no, I don't want to talk anymore."

The prosecutor continued to question the sergeant and defense counsel eventually

approached the bench and moved for a mistrial based on the earlier answer by Sergeant

Hall referencing McGeorge's decision not to talk.[113]  Later, after the jury exited, the court

heard further argument on the motion.[114]  The court cautioned the prosecutor that the

question bordered on inappropriate, but denied the motion for mistrial.  The court found

the comment harmless and not sufficiently significant to warrant a mistrial.  The court

doubted any jury inference in light of the circumstances of the questioning.

On direct appeal, although the court found the issue procedurally defaulted and not

properly preserved for review, the Louisiana First Circuit held that the comment was not

---

[111]Id., p. 116.

[112]Id.

[113]Id., p. 117.

[114]Id., p. 123.

intended to impeach the defendant and therefore was not improper under <u>Doyle v. Ohio</u>, 426 U.S. 610 (1976).

In general, the prosecution is prohibited from using a defendant's post-arrest silence as incriminating evidence or for impeachment purposes. <u>Doyle</u>, 426 U.S. at 610. In <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), the Supreme Court established the standard for determining whether a <u>Doyle</u> error merits relief on collateral review. The Supreme Court held that a <u>Doyle</u> error must be assessed in terms of its potential impact on the jury and that a <u>Doyle</u> error can be considered harmless. <u>Id</u>. at 638. In <u>Brecht</u>, because the prosecution had referred to the defendant's silence only infrequently, and because the other evidence of guilt was substantial, the Court concluded that the <u>Doyle</u> error did not substantially influence the jury's verdict and that federal habeas corpus relief was not warranted. <u>Id</u>. at 639.

In <u>United States v. Carter</u>, 953 F.2d 1449 (5th Cir. 1992), the Fifth Circuit considered the effect of comments by a prosecutor and arresting officer that the defendant would not make any statements. The court held that although such remarks constituted a <u>Doyle</u> error, the error was harmless. The court reasoned that the potential for prejudice was insufficient to warrant reversal because "the prosecutor did not focus or follow up on the response. Indeed, since [the defendant] had not at that point of the trial offered any exculpatory story, the evidence could have had only a minor effect as slight substantive evidence or remote impeachment-in-advance." <u>Id</u>. at 1463. Even though the error was

compounded by the prosecutor's later impeachment of the defendant with his silence and by a comment on the defendant's silence during closing argument, the court nonetheless held that the error was harmless. Id. at 1465-67.

In the present case, the challenged comment from Sergeant Hall is similar to the first comment considered in Carter. The fact that McGeorge announced to Sergeant Hall his decision to stop talking had virtually no evidentiary significance in the prosecution's case. The cessation of the conversation was reported in the sequence of events which led to McGeorge's return to St. Tammany Parish. His silence was not emphasized by the prosecution, nor was it repeated at any other point in the proceedings. The evidence showed that McGeorge had given several pre-arrest statements to police, and the State's case focused on those other statements. Since no adverse consequences could have attached to Sergeant Hall's response, the error was clearly harmless and did not amount to a constitutional violation. Federal habeas corpus relief is not warranted.

McGeorge is not entitled to relief on his claims that the state trial court erred in denying his motions for mistrial.

## VIII.   ASSISTANCE OF COUNSEL (CLAIM NOS. 1-6, 8)

McGeorge alleges that his trial counsel was ineffective on seven grounds: (A) Trial counsel failed adequately to investigate the case, including failure to impeach State witnesses and secure impeachment evidence to rebut the State's case. (B) Trial counsel failed to communicate with McGeorge about trial testimony, including preparing

McGeorge's trial testimony. (C) Trial counsel failed to communicate with a private investigator hired to assist in the case. (D) Trial counsel failed to assert a valid mitigation defense. (E) Trial counsel failed to challenge the State's expert witness. (F) Trial counsel waived the pretrial motion to suppress evidence. (G) Trial counsel's cumulative errors denied McGeorge effective assistance of counsel.

As noted above, the state trial court was the only state court given an opportunity to review these claims. It denied relief, finding that McGeorge failed to meet either prong of the Strickland test.

The standard for judging performance of counsel was established by the United States Supreme Court in Strickland, 466 U.S. at 668, in which the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice. Strickland, 466 U.S. at 697. The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. Kimler, 167 F.3d

45

at 893.  A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.'  It is not enough under Strickland, however, 'that the errors had some conceivable effect on the outcome of the proceeding.'"  Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994) (quoting Strickland, 466 U.S. at 693).

On federal habeas review, scrutiny of counsel's performance "must be highly deferential," and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance."  Moore v. Johnson, 194 F.3d 586, 591 (5th Cir. 1999) (citing Strickland, 466 U.S. at 689-90).  In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial.  Strickland, 466 U.S. at 689; Neal v. Puckett, 286 F.3d 230, 236-37 (5th Cir. 2002); Clark v. Johnson, 227 F.3d 273, 282-83 (5th Cir. 2000), cert. denied, 531 U.S. 1167 (2001).

The United States Supreme Court has recently clarified that, under Strickland, "[t]he question is whether an attorney's representation amounted to incompetence under

prevailing professional norms, not whether it deviated from best practices or most common custom." <u>Harrington v. Richter</u>, __ U.S. __, 131 S.Ct. 770, 788 (2011).[115]

"A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." <u>Bell v. Cone</u>, 535 U.S. 685, 697 (2002) (citing <u>Strickland</u>, 466 U.S. at 689). This court must apply the "strong presumption" to counsel's strategy and defense tactics which fall "within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 690. Federal courts have consistently recognized that tactical decisions when supported by the circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance. <u>Lamb v. Johnson</u>, 179 F.3d 352, 358 (5th Cir. 1999) (citing <u>Rector v. Johnson</u>, 120 F.3d 551, 564 (5th Cir. 1997) and <u>Mann v. Scott</u>, 41 F.3d 968, 983-84 (5th Cir. 1994)). Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. <u>Strickland</u>, 466 U.S. at 689;

---

[115]The <u>Harrington</u> court recognized the high level of deference owed to a state court's findings under <u>Strickland</u> in light of the AEDPA:

> The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

As discussed above, the AEDPA deferential standard is not being applied here, since McGeorge failed to exhaust state court remedies and did not give the state courts a full round of review.

<u>Moore</u>, 194 F.3d at 591. The burden is on petitioner to demonstrate that counsel's strategy was constitutionally deficient. <u>Id</u>.

A.    <u>INVESTIGATE AND IMPEACH STATE'S WITNESSES</u>

McGeorge alleges that counsel erred in failing to subpoena his employment records to challenge the time frame of the murder. He argues that a challenge to the timing of the murder may have led to a lesser verdict by altering the jury's perception of McGeorge's level of intent to kill. He also alleges that counsel did not interview witnesses, including Charles Edwards, who was present when the deputies searched the car. He contends that this would have bolstered his assertion that the police acted improperly in searching the car and taking his statements.

"'A defendant who alleges a failure to investigate on the part of his counsel must allege <u>with</u> <u>specificity</u> what the investigation would have revealed and how it would have altered the outcome of the trial.'" (emphasis added, citation omitted) <u>Moawad v. Anderson</u>, 143 F.3d 942, 948 (5th Cir. 1998). A petitioner cannot show prejudice with respect to a claim that counsel failed to investigate without adducing what the investigation would have shown. <u>Diaz v. Quarterman</u>, 239 Fed. Appx. 886, 890 (5th Cir. 2007) (citing <u>Strickland</u>, 466 U.S. at 696 in recognizing that some evidence is required to show that "the decision reached would reasonably likely have been different."). Rather, to prevail on a such claim, the petitioner must provide factual support as to what <u>exculpatory</u> evidence further investigation would have revealed. <u>See</u> <u>Moawad</u>, 143 F.3d

at 948; see also Brown v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005); Davis v. Cain, No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008) (order adopting Report and Recommendation).

"[A]n attorney's strategic choices, usually based on information supplied by the defendant and gathered from a thorough investigation of the relevant law and facts, 'are virtually unchallengeable.'" Bryant v. Scott, 28 F.3d 1411, 1415 (5th Cir.1994) (quoting Strickland, 466 U.S. at 691). While an attorney must engage in a reasonable amount of pretrial investigation, "the reasonableness of an attorney's investigation may critically depend on the information forwarded by the defendant and the defendant's own strategic decisions about his representations." Bryant, 28 F.3d at 1415.

McGeorge suggests that his counsel should have produced employment records to challenge the timing of the murder. McGeorge, however, is the one who provided police with the timing of the murder. McGeorge seems to suggest that counsel should have produced evidence that would have conflicted with McGeorge's own statements and testimony that the murder occurred on a Sunday evening. McGeorge has not shown that counsel acted outside of reasonable practice or the scope of reasonable trial strategy in avoiding impeachment of his client's own testimony.

He further complains that counsel failed to investigate the Green sisters' testimony that "Popeye" was in the car with McGeorge when they last saw McGeorge visit Certain that weekend. McGeorge told police and the jury that he had been to Certain's to buy

49

drugs more than once that weekend. He also testified that he was alone when he picked up Certain on Sunday before the murder. McGeorge has not established that a conflict necessarily existed between McGeorge's recollection of his last stop at Certain's house and the last time the Green sisters saw Certain over that weekend. More importantly, the jury was able to hear the testimony of both Greens and McGeorge to make their own credibility judgment. Counsel's decision to pursue certain lines of questioning falls within the ambit of sound trial strategy and is not to be second guessed on collateral review.

McGeorge also suggests that his counsel failed to investigate or interview other witnesses. The only specific witness referenced was Charles Edwards, who arrived after officers caught McGeorge washing Certain's blood from his wife's car. McGeorge suggests that Edwards might have been able to corroborate his claim that he asked for counsel before police searched the car. However, McGeorge has not provided any proof as to what Edwards would have testified. He also has not presented any proof that counsel actually did not interview Edwards. Such proof, however, would not be appropriately presented here for the first time. See Cullen, 131 S. Ct. at 1401 ("At a minimum, therefore, § 2254(e)(2) still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court.") (citing Williams v. Taylor, 529 U.S. at 427-429). As presented, his claim is purely speculative and not sufficient to warrant habeas relief.

"'Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.'" Graves v. Cockrell, 351 F.3d 143, 156 (5th Cir. 2003) (quoting Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978)). "'Failure to present [evidence does] not constitute 'deficient' performance within the meaning of Strickland if [counsel] could have concluded, for tactical reasons, that attempting to present such evidence would be unwise.'" Williams v. Cockrell, 31 Fed. Appx. 832 (5th Cir. 2002) (quoting Williams v. Cain, 125 F.3d 269, 278 (5th Cir. 1997)). In this case, the evidence and testimony were clear that McGeorge was not under arrest when the car was searched and that the officers acted with probable cause in searching the car after McGeorge told the officers his first version of the attack on Certain.

McGeorge has presented nothing, other than his self-serving argument, to establish that counsel did not contact Edwards or any other witnesses or investigate them as potential, favorable trial witnesses. The record does not demonstrate that counsel acted outside of sound trial strategy in choosing his witnesses, the focus of the case and the presentation of the self-defense argument. The fact that the defense was not successful does not mean that counsel was deficient. See Martinez v. Dretke, 99 Fed. Appx. 538, 543 (5th Cir. 2004) ("Again, an unsuccessful strategy does not necessarily indicate constitutionally deficient counsel."). "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of

counsel was unreasonable." Strickland, 466 U.S. at 689 (citations omitted). McGeorge has provided no basis to undermine the deference due his counsel's trial decisions. He is not entitled to relief on this claim.

B.      COMMUNICATE WITH AND PREPARE McGEORGE

McGeorge argues that an attorney has a duty to return his client's phone calls and to prepare the client to testify at trial. McGeorge does not actually allege that his counsel failed to return his phone calls; he merely implies it by referencing this duty. This is not sufficient to present an argument to this court or to establish that counsel acted outside the reasonable standards of practice.

McGeorge argues that counsel did not prepare him to testify at trial. In support, McGeorge argues that "[o]n direct appeal, the Louisiana First Circuit Court of Appeals [sic] noted the problems with Mr. McGeorge's unprepared testimony and the manner in which it directly contributed to the verdict, stating, 'misrepresentation reasonably raises the inference of a guilty mind.'"[116] This in itself is a blatant misrepresentation of the finding made by the Louisiana First Circuit. The appellate court was not in any way commenting on the preparedness of McGeorge's in-court testimony. In fact, read in proper context, the court was commenting on the persistent lies and misrepresentations in McGeorge's own pre-arrest activities and statements to police. In addressing the

---

[116]Rec. Doc. No. 1, p. 14.

sufficiency of the evidence, the court described McGeorge's actions after the murder as "an extensive cover-up of any incriminating evidence connecting him to the shooting."[117]

After recounting his "cover-up" actions between the murder and his arrest, the court found that in light of McGeorge's lies and misrepresentations to police before his arrest, the jury was reasonable in reaching its verdict. In doing so, the court made the following comment:[118]

> A finding of purposeful misrepresentation reasonably raises the inference of a "guilty mind," as in the case of flight following an offense or the case of material misrepresentation of facts by the defendant following an offense. Lying has been recognized as indicative of an awareness of wrongdoing. [State v.] Captville, 448 So.2d [676], 680 n.4 [(La. 1984)]. The facts in the instant matter established acts of both flight and material misrepresentation by the defendant.

The misrepresentations referenced by the state appellate court were in no way a comment on McGeorge's unpreparedness to testify at trial. Instead, it was a reference to McGeorge as a liar. The comments were clearly directed at the evidence of McGeorge's actions before his arrest (including that to which he confessed) and to matters occurring long before his counsel enrolled in his case. McGeorge cannot blame his trial counsel for his own persistence in falsifying information presented to the police.

---

[117]State v. McGeorge, 2008 WL 425612, at *5; St. Rec. Vol. 5 of 8, 1st Cir. Opinion, 2007-KA-0997, p. 10, 2/8/08.

[118]Id., 2008 WL 425612, at *5; St. Rec. Vol. 5 of 8, 1st Cir. Opinion, 2007-KA-0997, p. 11, 2/8/08.

To the extent counsel could have provided McGeorge with more preparatory advice before he took the stand, there has been no showing that this had any impact on the well-supported verdict reached by the jury. Without some showing that counsel acted deficiently or caused some prejudice to the defense, McGeorge's claim must fail. He is not entitled to relief on this issue.

C.    COMMUNICATE WITH PRIVATE INVESTIGATOR

McGeorge alleges that his counsel performed deficiently in failing to communicate with Terry Parta, a private investigator hired to assist in the case. Citing Ake v. Oklahoma, 470 U.S. 68 (1985), he suggests that counsel denied him his right to have an investigator assist in his defense. He claims that the failure to communicate was prejudicial, as could only be developed at an evidentiary hearing on the issue.

As an initial matter, McGeorge's reliance on Ake is misplaced. In Ake, the Supreme Court held that, when requested, an indigent defendant is entitled to funding for psychiatric expert assistance when he "demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." Ake, 470 U.S. at 82-83. The Supreme Court explained that "when the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense." Ake, 470 U.S. at 80. McGeorge's mental competence was not at issue in his trial, and there is no suggestion that Parta was hired to investigate his mental state.

54

When a habeas petitioner claims that an investigator should have been utilized in preparing for trial, federal habeas relief is <u>not</u> warranted, unless it is shown that the failure to use an investigator in fact "substantially prejudiced [the petitioner's] trial." <u>Jackson v. Day</u>, No. 96-30563, 1997 WL 450202, at *2 (5th Cir. July 16, 1997). If evidence of the petitioner's guilt is overwhelming, that showing cannot be made. <u>Id</u>. at *3.

As an initial matter, McGeorge has failed to present any proof, such as affidavits or sworn testimony, that his counsel did not communicate with Parta or use information received from him. There also is no indication in the record of what, if anything, Parta may have discovered that was not presented to the jury. Such proof, if brought here for the first time, would not be appropriate for this court's habeas review. <u>See</u> <u>Cullen</u>, 131 S. Ct. at 1401. McGeorge again relies strictly on speculation and presents nothing to indicate that counsel acted beyond the boundaries of reasonable practice or that he did anything that caused prejudice to the defense. As discussed above, the evidence against McGeorge, including his own inculpatory statements, was substantial and sufficient to support the verdict. He cannot show that any failure to utilize Parta was prejudicial to his defense. McGeorge is not entitled to relief on this claim.

D.   ASSERT MITIGATING DEFENSE

McGeorge claims that counsel erred in failing to investigate and hire an expert to support a possible defense related to his drug addiction and post-traumatic stress disorder. It is well established that counsel has "a duty to make reasonable investigations" into potential mitigating evidence or "to make a reasonable decision that makes particular investigations unnecessary." Wiggins v. Smith, 539 U.S. 510, 521 (2003) (addressing sentencing in capital cases) (quoting Strickland, 466 U.S. at 691). In determining whether trial counsel's performance was deficient, courts must "focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [a petitioner's] background was itself reasonable." Wiggins, 539 U.S. at 522-23 (emphasis in original).

The Supreme Court has emphasized that "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant . . .," nor "does Strickland require defense counsel to present mitigating evidence . . . in every case." Wiggins, 539 U.S. at 532-533. Rather, Strickland requires counsel to ensure that the decision to limit investigations is supported by "reasonable professional judgment." Id.

The burden is on McGeorge to establish that counsel erred in failing to investigate mitigating evidence. As noted above, McGeorge is required to allege with specificity what counsel's investigation would have revealed and how it would have affected the

verdict.  <u>Moawad</u>, 143 F.3d at 948.  A petitioner cannot show prejudice with respect to a claim that counsel failed to investigate and present mitigating evidence without adducing what the investigation would have shown.  <u>Diaz</u>, 239 Fed. Appx. at 890 (citing <u>Strickland</u>, 466 U.S. at 696 in recognizing that some evidence is required to show that "the decision reached would reasonably likely have been different.").

Once again, McGeorge has failed to present any proof that he suffered from any psychological disorder that could have been raised at the time of trial by counsel.  In fact, McGeorge and his wife both testified that, at the time of the murder, he had only just returned to his use of street drugs, and he was not on prescription medication.  He has not demonstrated how an expert on his drug use would have benefitted the defense.

McGeorge has made no showing that his defense was substantially prejudiced.  He suggests only that an expert or investigator may have assisted counsel and that counsel should have investigated the potential for such a defense.  McGeorge's counsel presented evidence and argument that McGeorge struggled with drug addiction and felt threatened by Certain when the shooting occurred. McGeorge has not pointed to anything that an expert or other investigator might have presented to sway the jury to reach a different verdict.  There is nothing in the record to suggest that he was prejudiced by counsel's failure to investigate the potential for a possible defense related to his drug use or alleged post-traumatic stress disorder.  His unsupported claim alone is not sufficient to establish a deficiency in counsel's performance or any prejudice resulting from

counsel's representation.  See Brown, 419 F.3d at 375.  He is not entitled to relief on this issue.

E.    CHALLENGE THE STATE'S EXPERT WITNESS

McGeorge argues that counsel was deficient in failing adequately to challenge the testimony of the State's dirt expert.  McGeorge suggests that counsel should have challenged the testimony by establishing that McGeorge had "every legal reason" to be on the family farm, where Certain's body was found, to de-emphasize the importance of the presence of dirt on his truck.

I first note that McGeorge has presenting nothing to this court that would indicate that he had any legal right to be on his wife's uncle's farm.  A review of the trial transcript indicates that the defense presented testimony that McGeorge had frequented his wife's uncle's farm to hunt in the 1990's.  There was no evidence or testimony that McGeorge or his wife frequented the farm in his wife's car during the time around the murder sufficient to have warranted presentation of evidence to explain away the dirt in the tires.  In addition, Mr. Prats testified that he had not seen McGeorge at the farm since he moved home in 2000, two years before the murder.

McGeorge himself eventually told police and testified at trial that he dumped Certain's body on the farm.[119]  There was no reason for counsel to challenge the dirt

---

[119]St. Rec. Vol. 4 of 8, Trial Transcript, pp. 55-58, 5/18/06.

evidence that linked McGeorge to the farm because McGeorge linked himself to the farm. McGeorge has made absolutely no showing that counsel performed deficiently or prejudice the defense in any way in his decision not to challenge the evidence about the dirt.

F.      WAIVED PRETRIAL MOTION TO SUPPRESS EVIDENCE

McGeorge contends that his trial counsel erred in waiving the motion to suppress the evidence. He argues that a successful motion would have caused the trial court to suppress the evidence seized from the car. He also argues that the evidence should have been suppressed based on the decision of the Supreme Court in Gant, 129 S. Ct. at 1710, issued in 2009, several years after counsel waived the motion to suppress.

McGeorge also argues the merits of the motion to suppress in light of Gant, which he claims was a new rule of law. I have already discussed above that McGeorge's arguments under the Fourth Amendment are barred from review by the Stone doctrine. The issue before this court is whether counsel performed deficiently or prejudicially in 2005 when he waived the motion to suppress. Thus, I will consider the validity of the motion to suppress only to the extent necessary to assess counsel's performance under Strickland.

The record indicates that counsel waived the motion to suppress based on the information and evidence he had at the time about items seized from the scene when

McGeorge was first stopped by Officer Day.[120]  In his request to re-open, counsel argued to the state trial court that he had just learned at trial that evidence was seized without a warrant after the car was impounded.[121]  Although his motion to re-open was unsuccessful, the question is whether he acted deficiently in initially waiving the motion. This is to be judged at the time he waived it and not in hindsight or in light of Gant, as McGeorge argues.

According to counsel's representations to the state trial court, he made the decision to waive the motion to suppress based on the evidence before him in 2005.  This certainly was reasonable and was not deficient performance.  Reading the record as a whole, there is some indication that the information he considered to be "new" at trial was discoverable from the state's file during open file discovery.  As noted by McGeorge, the record is void of any information as to when the pictures and report were placed in the file.  There also is no indication of when counsel reviewed the State's file in discovery.

Assuming that the information was in the state's record and was discoverable by or available to defense counsel, McGeorge has failed to establish any prejudice to the defense arising from waiver of the motion or his failure to discover the information relied on to move to re-open.  As resolved by the Louisiana First Circuit, the motion to suppress

---

[120]St. Rec. Vol. 3 of 8, Trial Transcript, pp. 5-6, 5/17/06; see also, State v. McGeorge, 2008 WL 425612, at *6; St. Rec. Vol. 5 of 8, 1st Cir. Opinion, 2007-KA-0997, p. 14, 2/8/08; St. Rec. Vol. 2 of 8, Motion Hearing Transcript, 8/25/05.

[121]Id., p. 6.

would not have been successful, because Deputy Day had probable cause to search the car without a warrant.[122]

The Fourth Amendment generally requires police to secure a warrant before conducting a search. <u>California v. Carney</u>, 471 U.S. 386, 390-391 (1985). The Supreme Court recognizes an automobile exception to this requirement. <u>Maryland v. Dyson</u>, 527 U.S. 465, 466 (1999) (citing <u>Carroll v. United States</u>, 267 U.S. 132, 153 (1925)). "[W]here there was probable cause to search a vehicle "a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.'" <u>Id</u>. at 467 (quoting <u>United States v. Ross</u>, 456 U.S. 798, 809 (1982)).

Probable cause does not require definite knowledge. "Probable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules." <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983). Probable cause only entails "the probability, and not a prima facie showing, of criminal activity." <u>Id</u>. at 235 (citing <u>Spinelli v. United States</u>, 393 U.S. 410, 419 (1969) (internal quotes omitted). The determination of probable cause is given "great deference by reviewing courts." <u>Gates</u> 462 U.S. at 236 (quoting <u>Spinelli</u>, 393 U.S. at 419). Given this deferential standard, counsel's decisions whether to make certain

_____

[122]<u>Id</u>., 2008 WL 425612, at *6; St. Rec. Vol. 5 of 8, 1st Cir. Opinion, 2007-KA-0997, p. 14, 2/8/08.

arguments regarding an erroneous determination on probable cause are also due deference under the <u>Strickland</u> standard, unless they clearly fall below an objective standard of reasonableness.

In this case, the record indicates that upon being confronted by Deputy Day, McGeorge first told him that he was cleaning the car after spilling food items. Because he was inconsistent with the facts of that story, Deputy Day called for a supervisor to assist in the situation. While awaiting the supervisor's arrival and after talking with his wife, McGeorge told Deputy Day that he had been physically confronted by a man in his car, and he bludgeoned the man with a maul while he was still in the car. Under these circumstances, Deputy Day had ample cause to believe that a crime had been committed in the car, even considering McGeorge's claim to be the victim. The deputy was not required to obtain a warrant before seizing or searching the car.

Even under the later decision in <u>Gant</u>, the motion and the ineffective assistance of counsel claim are no less meritless. First, assuming that McGeorge is correct that <u>Gant</u> was a new rule of constitutional law, this would be all the more reason why counsel was not unreasonable in failing to argue a legal premise that did not exist when he waived the motion to suppress in 2005.

In addition, the <u>Gant</u> decision does not apply to McGeorge's case. The <u>Gant</u> Court considered the appropriateness of a vehicular search incidental to a lawful arrest. <u>Gant</u>, 129 S. Ct. at 1716. The Court held that its prior precedent authorized "police to search

a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." Id. at 1719. The Court also concluded that "that circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" Id.

The instant case is distinguishable from the matters considered in Gant. McGeorge was not arrested on the evening he spoke with Deputy Day. He was not arrested when his car was searched for evidence of a crime in which he claimed to be the victim, not the perpetrator. In addition, even if McGeorge considered himself detained, he was within reach of the car during his conversations with Deputy Day at the scene, until he was eventually escorted to the station to give his victim's statement. Nothing in Gant would have prevented the police from searching and seizing the car or evidence in the car without a warrant under these circumstances.

Counsel did not act deficiently or prejudicially in waiving a meritless motion. See Smith v. Puckett, 907 F.2d 581, 585 n.6 (5th Cir. 1990) ("Counsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim."); see also, Koch v. Puckett, 907 F.2d 524, 530 (5th Cir. 1990) (concluding that "counsel is not required to make futile motions or objections."). McGeorge is not entitled to relief on this claim.

G.    CUMULATIVE ERRORS

McGeorge argues that the errors of counsel when combined created cumulative prejudice at his trial.  McGeorge relies on the decision in <u>Perez v. Dretke</u>, 172 Fed. Appx. 76 (5th Cir. 2006), to suggest that cumulative errors by counsel form the basis of federal habeas review.  The court in that case discussed when the "cumulative error doctrine" could be applied to "cumulative trial-court errors," such as errors of state law and evidentiary errors.  <u>Id</u>. at 82. The court did <u>not</u> address whether a federal habeas claim could be made for the cumulation of deficiencies in the performance of counsel under <u>Strickland</u>.

McGeorge has failed to identify any constitutional error in trial counsel's performance, leaving no basis for any alleged cumulative prejudicial effect of any error. <u>See</u> <u>Turner v. Quarterman</u>, 481 F.3d 292, 301 (5th Cir. 2007) (citing <u>Derden v. McNeel</u>, 978 F.2d 1453, 1454, 1461 (5th Cir. 1992) (Meritless claims or claims that are not prejudicial cannot be cumulated regardless of the total number raised)).   When the individual contentions of ineffective assistance are meritless, that result cannot be changed simply by asserting the same claims collectively.  "[I]neffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions." <u>United States v. Hall</u>, 455 F.3d 508, 520 (5th Cir.2006) (citing <u>Miller v. Johnson</u>, 200 F.3d 274, 286 n.6 (5th Cir. 2000)); <u>Sholes v. Cain</u>, 370 Fed. Appx. 531, 535 (5th Cir.

2010); <u>Mullen v. Blackburn</u>, 808 F.2d 1143, 1147 (5th Cir. 1987) (with respect to cumulation of meritless claims, "Twenty times zero equals zero.").

For these reasons, McGeorge has not shown his entitlement to consideration of or relief on the theory of cumulative error arising from counsel's performance. He is not entitled to relief on this claim.

## RECOMMENDATION

For the foregoing reasons, it is **RECOMMENDED** that the petition of Kenneth McGeorge for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v.</u>

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[123]

New Orleans, Louisiana, this \_\_\_\_10th\_\_\_ day of February, 2012.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[123]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.